# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.               Case No. 16-CR-107

**HANUEL CORBITT**
   **Defendant.**

## DECISION AND ORDER

Defendant Hanuel Corbitt moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

### I. FACTS AND BACKGROUND

In May of 2016, law enforcement agents received information from a confidential source ("CS") about the drug trafficking activities of "Danny" and "Red Car." The CS identified "Danny" as defendant Corbitt from a photograph. According to the CS, defendant was a multi-kilogram cocaine distributor operating in the Milwaukee area. The CS was aware that "Danny" used a female subject, known to the CS only as "Red Car," to assist in the storage and distribution of the cocaine as well as the collection of proceeds from cocaine sales. (PSR ¶ 11.) "Red Car" was later identified as the co-defendant in this case, Marlena Scott. (PSR ¶ 14.)

On May 18, 2016, the CS, acting under the direction of case agents, had a recorded conversation with defendant, during which defendant told the CS he would have Red Car come with "Two McDonalds," which the CS understood to refer to a nine ounce quantity of cocaine. (PSR ¶¶ 12-13.) The CS then spoke to Scott, they arranged to meet, and Scott subsequently delivered three heat sealed plastic bags, each containing a quantity of cocaine, totaling 27

ounces or ¾ of a kilogram. (PSR ¶¶ 15-16.)

The government charged defendant with distribution of cocaine, contrary to 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and he later pleaded guilty to the charge. During the pre-sentence interview, defendant stated that he did not have a good explanation as to why he became involved in the offense. He wanted to make money even though he did not need more money. (PSR ¶ 22.) He had since 2014 owned his own trucking company, which operated several dump trucks and employed a number of people. (PSR ¶ 85.)

The pre-sentence report ("PSR") noted prior convictions for possession with intent–THC (twice) in 2003, felon in possession of a firearm and possession with intent–THC in 2004, and possession with intent–THC and felon in possession of a firearm in 2005 (PSR ¶¶ 39-42), resulting in a career offender designation under the sentencing guidelines and an imprisonment range of 188-235 months (PSR ¶¶ 31, 94). The PSR further noted that defendant committed the instant offense while on extended supervision in the 2005 case. (PSR ¶ 44.)

Defendant appeared for sentencing on October 25, 2018, and I concluded that a significant prison term was necessary to reflect the seriousness of the offense, which involved a substantial amount of cocaine; to deter defendant, as being on supervision did not suffice; and to protect the public from further crimes of the defendant, given his lengthy record for this kind of conduct. I did find a term below the guideline range sufficient, however, noting that his prior offenses involved relatively modest amounts of THC, with no indication of violence or firearm use. I further noted that he appeared to have done well recently, working, avoiding drugs, and complying with pre-trial release conditions for an extended time in this case. Under all the circumstances, I found a sentence of 90 months sufficient but not greater than necessary to satisfy the purposes of sentencing.

2

Defendant is currently serving his sentence at FPC Duluth, with a projected release date of August 31, 3024. He is now 38 years old. (PSR at 2.)

On October 28, 2020, defendant filed a pro se motion for compassionate release. I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions, and on December 16, 2020, FDS filed a supplemental brief on defendant's behalf. The government then responded and defendant replied. The matter is ready for decision.

## II. DISCUSSION

### A. Compassionate Release Standards

Section 3582(c)(1)(A) authorizes the district court to grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a

3

reduction of the sentence would be inconsistent with the applicable 18 U.S.C. § 3553(a) factors. United States v. Cole, No. 08-CR-327, 2021 U.S. Dist. LEXIS 2404, at *5 (E.D. Wis. Jan. 7, 2021).

   **1.   Exhaustion**

Before 2018, compassionate release required a motion from the BOP. United States v. Sanford, 786 F.3d 779, 781 (7th Cir. 2021). However, the First Step Act of 2018 amended the compassionate release statute to permit the court to adjudicate a motion directly from the defendant—provided, however, that the defendant must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Id. at 781-82. The Seventh Circuit has held that, while this "exhaustion" requirement is not jurisdictional, it is a mandatory claim-processing rule which must be enforced if raised by the government. Id. at 782; see also United States v. Williams, 987 F.3d 700, 703 (7th Cir. 2021) (holding that "an inmate is required to present the same or similar ground for compassionate release in a request to the Bureau as in a motion to the court").

   **2.   Extraordinary and Compelling Reasons**

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria

4

to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[1] The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1) (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13 (2018). The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or

---

[1] Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id. Courts have held that "while rehabilitative efforts alone will not support compassionate release, the court may take such efforts into account as part of the analysis." United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020); see also United States v. Hudson, 967 F.3d 605, 613 (7th Cir. 2020) (noting that the court may in deciding a First Step Act motion consider the defendant's post-sentencing conduct as part of the § 3553(a) analysis).

5

> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which, as indicated, allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 1078, 1080 (7th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the

now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their common meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, or regular, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020); see also Gunn, 980 F.3d at 1080 (noting that the Commission's analysis can guide discretion without being conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

### 3. Section 3553(a) Factors

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. See United States v. Saunders, 986 F.3d 1076, 1078 (7th Cir. 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns."). Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the

public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020).

**B.    Defendant's Motion**

**1.    Exhaustion**

Defendant requested release through the warden on May 12, 2020, later renewing his request through a case manager, with the warden denying the request on July 9, 2020. He made another administrative request for compassionate release on September 30, 2020, which the warden denied on October 13, 2020. (R. 74 at 1-2; 74-1 at 1-3; R. 78 at 4; R. 78-1 at 1-2.) Since more than 30 days have passed since the warden's receipt of his requests, defendant has satisfied the exhaustion requirement.[2]

**2.    Extraordinary and Compelling Reasons**

**a.    Positions of the Parties**

Defendant seeks release based on the COVID-19 pandemic, which has hit prisons particularly hard; his health problems, including obesity, elevated blood pressure, and pre-diabetes; and the conditions at FPC Duluth, which experiences a higher turnover rate than

---

[2]In its response, the government presumes that defendant has exhausted and proceeds to argue the motion on the merits. (R. 84 at 5.)

8

other facilities, sits in a region with a high rate of infection, and has experienced COVID cases among inmates and staff. (R. 74 at 2-5; R. 74-1 at 4-6; R. 78 at 1-3.) In the supplement filed by FDS, defendant indicates that he tested positive on November 2, 2020. While his case was asymptomatic, he notes that any potential immunity following recovery is temporary and uncertain, and he remains at high risk of reinfection within the confines of prison (R. 78 at 1, 3), citing the CDC's warning that persons in correctional facilities are at greater risk because of their close living arrangements (R. 78 at 6). The death rate for prisoner is also much higher than the population at large. (R. 78 at 7-8.) Defendant further notes that, as of December 16, 2020, FPC Duluth reported 6 positives inmates, 1 positive staff member, 198 recovered inmates, and 19 recovered staff members. (R. 78 at 2, 6-7.)

Regarding his specific circumstances, defendant cites research indicating that those with diabetes are at increased of hospitalization or death from COVID-19. (R. 78 at 8-10.) The CDC has also recognized that obese persons are at higher risk. (R. 78 at 10-11.) Defendant notes that his mother and two aunts, who were also obese, died during the pandemic. (R. 74-1 at 11.) Defendant further notes that men and black Americans have fared worse during the pandemic. (R. 78 at 12.)[3] Defendant recovered from his infection, but he notes the uncertainty regarding the nature and extent of immunity after a person has recovered from the virus, with the best guess being it lasts for three to six months; since he has not been tested for antibodies, however, it cannot be known if he has any protection against the virus. (R. 78 at 13-15, 17.) He cites cases of reinfection, some more severe than the initial case. (R. 78 at 16-

---

[3]While systemic health and social inequities have put some members of racial and ethnic minority groups at increased risk, defendant presents no evidence that his race makes him more biologically susceptible or vulnerable to COVID-19 in prison. See United States v. Joiner, No. 20-2361, 2021 WL 688537, at *2 (7th Cir. Feb. 23, 2021).

9

17.) He also notes that many courts have, given this uncertainty, refused to rule out release simply because an inmate has already tested positive. (R. 78 at 18.) Finally, defendant notes that some persons who have "recovered" continue to experience long-term problems. (R. 78 at 19-21.) He concludes that his ongoing risks are real and considerable, justifying compassionate release. (R. 78 at 21.)

In response, the government notes that as of January 23, 2021, FPC Duluth reported no positive inmates and one positive staff case. (R. 84 at 1-2.) The government further contends that, while defendant has recognized risk factors, he has already had asymptomatic COVID, and he has not demonstrated that his obesity and pre-diabetes, which he is working to control with diet and exercise, pose such a high risk of reinfection as to support release, particularly from an institution with no inmate cases and imminent vaccine administration. (R. 84 at 2.) The government states that more than 17,000 doses of vaccine have been administered at more than half of BOP facilities, with all facilities expected to receive vaccine by mid-February. (R. 84 at 3.)

The government acknowledges that if an inmate has a chronic medical condition identified by the CDC as elevating risk of serious illness from COVID-19, that condition may satisfy the standard of extraordinary and compelling reasons. (R. 84 at 6.) The government contends that, while the CDC indicates obesity is a risk factor, defendant's lab work has been normal, he has discussed with medical staff his goal of losing weight, and he rejected a prescription for a statin to reduce his cholesterol. (R. 84 at 6.) The government further acknowledges that diabetes is a CDC-recognized risk factor, but defendant has never complained to prison staff of any issue related to his pre-diabetes, a condition often treatable through diet and exercise. (R. 84 at 6.) Finally, the government notes that defendant's COVID

10

case was asymptomatic, which cuts against his argument that he must be released to avoid severe illness, and that his argument regarding possible reinfection is speculative. (R. 84 at 7.)

In reply, defendant states that the number of new infections and deaths continues to rise across the country, and inmates are particularly susceptible to infection given their housing conditions. (R. 86 at 1.) He also clarifies that he does not argue his health concerns increase his risk of infection; rather, his prison conditions increase <u>that</u> risk, and his underlying health concerns make infection more dangerous for him. (R. 86 at 2.) Indeed, the BOP itself categorizes defendant as a medically "high risk" inmate. (R. 86 at 3; R. 74-1 at 5.) While the BOP has made efforts to control the virus, many inmates have been infected and at least 200 have died; defendant and close to 200 other inmates at FPC Duluth tested positive. (R. 86 at 3.) Defendant further notes that any immunity after his recovery is uncertain, and it is unclear how imminent vaccination is. The best way to protect him, he contends, is release to the community to allow him to self-isolate and take other measures at home. (R. 86 at 3.)

### b. Analysis

I find that defendant has established a basis for release under § 3582(c)(1)(A)(i), albeit a marginal one. See <u>United States v. Hicks</u>, No. 18-CR-227, 2020 U.S. Dist. LEXIS 213100, at *17 (E.D. Wis. Oct. 7, 2020) (indicating that when a prisoner seeks compassionate release after contracting and recovering from the virus, the court should consider "the prisoner's specific medical problems and their severity, the course of his recovery from the virus, whether he displays any lingering symptoms or effects, and the conditions at his particular facility").

The medical evidence establishes that defendant suffers from at least one health condition—severe obesity (BMI of 40 or above)—recognized by the CDC as a COVID-19 risk

11

factor.[4] A November 30, 2020, health services note records a BMI of 45.0-49.9 (R. 80 at 2); an April 15, 2020, health services note indicates defendant "was reviewed for CDC high risk criteria and found to meet criteria related to: Obesity, BMI 44.3" (R. 74-1 at 5; R. 80 at 26); and an October 5, 2020 note indicates he meets "the criteria for the high risk list for covid-19" (R. 74-1 at 6).

On the other hand, as the government notes, the medical evidence documents no specific problems related to his weight. His most recent lab work from November 2020 indicates he is pre-diabetic, but not actually diabetic,[5] and he declined statin therapy for address his cholesterol, electing to focus on diet and exercise "to get his numbers down." (R. 80 at 1, 44.) His provider agreed with this plan. (R. 80 at 1.) During a June 2020 visit to health services his A1C was slightly elevated, and he indicated that once the COVID-19 quarantine was over he would get out more and exercise. (R. 80 at 22, 47.) The CDC has recognized that hypertension <u>might</u> increase a person's risk,[6] and defendant's records document a number of elevated blood pressure readings (R. 80 at 1, 22, 30) but no diagnosis of hypertension. During

---

[4]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity (last visited March 5, 2021).

[5]While pre-diabetes can lead to Type 2 diabetes, a CDC-recognized risk factor, <u>see</u> <u>United States v. Colon</u>, No. 97-CR-659-1, 2020 U.S. Dist. LEXIS 231864, at *5 (N.D. Ill. Dec., 2020), the CDC has not recognized pre-diabetes as a risk factor, <u>see</u> <u>United States v. Fortune</u>, No. 4:09-cr-40082, 2021 U.S. Dist. LEXIS 34345, at *7 (C.D. Ill. Feb. 23, 2021); <u>United States v. Meyer</u>, 2020 U.S. Dist. LEXIS 199117, at *18-19 (E.D. Wis. Oct. 27, 2020).

[6]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions (last visited March 5, 2021).

12

the pre-sentence interview in 2018, defendant "reported no history of chronic illnesses or medical conditions requiring treatment." (PSR ¶ 67.) At that time, he weighed 310 pounds at a height of 5'11", producing a BMI of 43.2. (PSR ¶ 64.)

The records also show that defendant's COVID case was entirely symptom free. After 14 days in isolation he was released back to the dorm. (R. 80 at 5, 8.) He alleges no ongoing effects from his infection. Finally, as of March 8, 2021, FPC Duluth reports no inmate or staff cases, no inmate or staff deaths, and 186 inmates and 20 staff recovered.[7] The BOP also reports 53 staff and 43 inmate inoculations completed at FPC Duluth.[8]

In sum, while defendant demonstrates heightened risk of severe illness from COVID-19 due to his weight, his COVID case was asymptomatic and his facility is now free of the virus (with vaccinations underway), suggesting that his need for release is not compelling. Nevertheless, I will find that he had made a colorable claim for release and proceed to consideration of the § 3553(a) factors.

### 3. Section 3553(a) Factors

#### a. Positions of the Parties

In his pro se motion, defendant notes that while incarcerated he has completed programming, incurred just one disciplinary violation, and achieved a "minimum" security classification. (R. 74 at 6-7; R. 74-1 at 9-13.) He further notes that he has completed about half of his sentence, and that on release he can assist his family and resume work in trucking. (R. 74 at 9; 74-1 at 11; R. 78 at 3.)

---

[7] https://www.bop.gov/coronavirus/ (last visited March 8, 2021).

[8] https://www.bop.gov/coronavirus/ (last visited March 8, 2021).

13

In the supplement, defendant argues that, having completed a substantial portion of his sentence, none of the purposes of sentencing require keeping him in prison. (R. 78 at 22.) He first notes that, during the pandemic, prison has been much more punitive, particularly for high-risk inmates. (R. 78 at 22.) He further notes that he has personally suffered great loss during the pandemic, with the death of his mother and two aunts due to COVID-19. (R. 78 at 23.)

Regarding the need to deter, defendant contends that sentence length does not correlate with deterrent effect, and that there is little more deterrence to be achieved by requiring him to serve out the sentence. (R. 78 at 23.) Regarding public safety, defendant stresses that the BOP has designated him a low-risk inmate, his institutional adjustment has been good, and he has no history of violence. (R. 78 at 23-24; R. 78-2 at 1-3.) He further notes that he complied with pre-trial release conditions for almost two years while this case was pending. (R. 78 at 24.) Finally, defendant notes that he has a stable home to return to, living with his wife, and that he could resume his work as a truck driver if released, as his wife has continued operating the trucking company (at reduced capacity) during his incarceration. (R. 78 at 25-26.)

The government contends that the § 3553(a) factors far outweigh any reasons presented in support of compassionate release. (R. 84 at 2.) The government first notes that defendant committed a serious offense, distributing a substantial amount of cocaine in the Milwaukee area, with a relevant conduct drug weight of more than 5 kilograms. (R. 84 at 8; PSR ¶¶ 19, 25.) The government further argues that defendant's record of drug trafficking, with four prior convictions, suggests a risk of recidivism and danger to the community. (R. 84 at 8.) While his priors involved marijuana, in this case he graduated to selling cocaine, a more dangerous drug. (R. 84 at 8-9.) He also has prior revocations of community supervision. (R. 84 at 9; PSR ¶¶

14

40, 41.) The government acknowledges that defendant has done well in prison but notes that he also adjusted well during previous prison terms (see PSR ¶ 81), yet returned to drug dealing on release (R. 84 at 9). The government further notes that, while defendant proposes to resume work in trucking on release, he was working in this capacity at the time he committed the instant offense. (R. 84 at 9; PSR ¶ 85.) Finally, the government notes that in June 2019 defendant was sanctioned for possession of a hazardous tool with loss of 41 days of good time. (R. 84 at 9.)

In reply, defendant take issue with the government's view that retribution and incapacitation support denial of his motion. (R. 86 at 4-5.) Regarding punishment, he notes that he has served approximately 34 months for a non-violent drug crime, with the punitive effect increased by the pandemic and his personal losses. (R. 86 at 5.) Regarding his risk of recidivism, he notes that it has now been nearly five years since his crime, and that he has aged, reducing his risk. (R. 84 at 5-6.) He further notes that his prior offenses involved marijuana, a substance many states have decriminalized, with no history of violence. He acknowledges his lone disciplinary violation but notes it involved a cell phone, not a weapon. (R. 86 at 6.) Finally, defendant indicates that he could be an asset to the community if released, providing letters from trucking associates. (R. 86 at 7; R. 86-1.) Defendant concludes that if released from prison he will not be free from restraint; he will be under supervision and could be placed on house arrest as a condition. (R. 86 at 7.)

### b. Analysis

Courts have in deciding compassionate release motions considered the amount of time remaining to be served on the sentence. E.g., United States v. Pawlowski, 967 F.3d 327, 331 (3d Cir. 2020) ("Because a defendant's sentence reflects the sentencing judge's view of the §

15

3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors."); see also Saunders, 986 F.3d at 1078 (holding that the district court "permissibly ruled that excusing him from two-thirds of his sentence for this crime would not promote respect for the law"); United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020) (holding that district court did not abuse its discretion in concluding that release after serving 14 years of 30-year sentence would minimize the seriousness of the offense).

According to his sentence computation data sheet, defendant surrendered to begin service of the sentence on or about November 22, 2018; he was awarded sentence credit from June 15, 2016 to January 23, 2017; and his projected release date is August 31, 2024. (R. 74-1 at 12.) He has thus completed about 34 months of his sentence, with about 42 months left to serve.[9] Reducing the sentence to time served would accordingly permit defendant's release after he has completed just 45% of his prison term. As discussed above, while I found a sentence below the career offender guideline range sufficient, a substantial prison sentence was necessary in this case to reflect the seriousness of the offense, to protect the public, and to deter defendant. Conservatively estimated, defendant was responsible for the distribution of at least five kilograms of cocaine in this case. (PSR ¶ 19.) He committed this offense after committing four previous drug trafficking offenses, after serving significant prison sentences (52 months in the 2005 case, PSR ¶ 42), and while on state extended supervision. This history seriously undermines defendant's contention that the time he has served suffices to satisfy the

---

[9]With good time, a 90-month sentence equates to about 76 months.

purposes of sentencing.

Defendant notes that prison time has been harder over the past year (and that he has experienced personal losses due to the pandemic). While this is a factor the court may consider, it does not tip the scale in defendant's favor given the amount of time he has yet to serve. Cf. United States v. Cochran, No. 01-CR-108, 2021 U.S. Dist. LEXIS 39580, at *20-21 (E.D. Wis. Mar. 3, 2021) (noting pandemic related hardships in granting release where the defendant had served about 90% of his sentence).

Defendant stresses his good conduct in prison, but he appears to have adjusted well during previous terms as well. (See PSR ¶ 81.) He also relies on his family support and employment, but these factors were also present at the time he committed the instant offense. (See PSR ¶¶ 60-61, 85.) While defendant will be required to serve a term of supervised release after completing the prison term, and he did well during his time on pre-trial release in this case, these facts must be balanced against the fact that he was on state supervision when he committed the instant offense, and that he has two previous revocations of supervision on his record. (PSR ¶¶ 40, 41.) Finally, while defendant notes that he is now older, he is still a relatively young man at age 38, and he committed this offense in his thirties.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for compassionate release (R. 74) is denied.

Dated at Milwaukee, Wisconsin, this 9th day of March, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

17